Rosemary M. Rivas (State Bar No. 209147)
Email: rrivas@zlk.com
**LEVI & KORSINSKY LLP**
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

Counsel for Individual and Representative
Plaintiff Felix Mendoza

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FELIX MENDOZA, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>GIGPEAK, INC., AVI KATZ, NEIL J. MIOTTO, KIMBERLY D.C. TRAPP, JOSEPH J. LAZZARA, JOHN J. MIKULSKY, and FRANK W. SCHNEIDER,<br><br>        Defendants. | Case No. 3:17-cv-1351<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Felix Mendoza, by his undersigned attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this action on behalf of himself and the public stockholders of GigPeak, Inc., ("GigPeak" or the "Company") against GigPeak's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below) for violations of Section 14(d)(4), and Rule 14D-9 promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC"), and Sections 14(e) and 20(a).  Specifically, Defendants solicit the tendering of stockholder shares in connection with the sale of the Company to Integrated Device Technology, Inc. ("Parent"), and its wholly-owned subsidiary, Glider Merger Sub, Inc. ("Merger Sub," and together with Parent, "IDT") through a recommendation statement that omits material facts necessary to make the statements therein not false or misleading.  Stockholders need this material information to decide whether to tender their shares or pursue their appraisal rights.

2.      On February 13, 2017, the Company announced that it had entered into a definitive agreement (the "Merger Agreement"), by which IDT would commence a tender offer (the "Tender Offer") to acquire all of the outstanding shares of GigPeak common stock for $3.08 per share in cash (the "Merger Consideration") in a transaction valued at approximately $250 million (the "Proposed Transaction").  The Tender Offer, commenced on March 7, 2017, and is set to expire at 11:59 P.M. New York City Time on April 3, 2017.

3.      In connection with the commencement of the Tender Offer, on March 7, 2017, the Company filed a Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the SEC.  The Recommendation Statement is materially deficient and misleading because, inter alia, it fails to disclose material information about the financial projections prepared by the Company and relied upon by the Company's financial advisor.  Without all material information GigPeak stockholders cannot make an informed decision to exchange their shares in the Tender Offer.  The failure to adequately disclose such material information constitutes a violation of §§ 14(d)(4), 14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") as stockholders need such

information in order to make a fully-informed decision regarding tendering their shares in connection with the Proposed Transaction about whether to tender their shares.

4. For these reasons and as set forth in detail herein, the Individual Defendants have violated federal securities laws. Accordingly, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of these laws. Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

**JURISDICTION AND VENUE**

5. The claims asserted herein arise under §§ 14(d), 14(e), and 20(a) of the Exchange Act, 15 U.S.C. § 78aa. The Court has subject matter jurisdiction pursuant to § 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6. The Court has personal jurisdiction over each of the Defendants because each conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper in this District under § 27 of the Exchange Act, 15 U.S.C. §78aa, as well as pursuant to 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) GigPeak maintains its principal place of business in this District and each of the Individual Defendants, and Company officers or directors, either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the transactions and wrongs complained of herein, occurred in this District; (iv) most of the relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and (v) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

8. Plaintiff is, and has been at all relevant times, the owner of shares of GigPeak common

stock.

9. Defendant GigPeak is a corporation organized and existing under the laws of the State of Delaware. The Company maintains its principal executive offices at 130 Baytech Drive San Jose, CA 95134. GigPeak common stock is traded on the New York Stock Exchange under the ticker symbol "GIG."

10. Defendant Dr. Avi Katz ("Dr. Katz") is Chairman of the Board of Directors and Chief Executive Officer of GigPeak. He has served as a director of GigPeak since July 2007.

11. Defendant Neil J. Miotto ("Miotto") has served as a director of GigPeak since December, 2008.

12. Defendant Kimberly D.C. Trapp ("Trapp") has served as a director of the Company since December, 2008.

13. Defendant Joseph J. Lazzara ("Lazzara") has served as a director of GigPeak since July 2011.

14. Defendant John J. Mikulsky ("Mikulsky") is a director of GigPeak as a director of GigPeak since June, 2011.

15. Defendant Frank W. Schneider ("Schneider") has served as a director of GigPeak since June, 2010.

16. Defendants Dr. Katz, Miotto, Trapp, Lazzara, Mikulsky, and Schneider, are collectively referred to as "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

17. Plaintiff brings this action individually and as a class action on behalf of all holders of GigPeak stock who are being, and will be, harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the Individual Defendant.

18. This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

19. The Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, as of March 1, 2017, GigPeak had 67,641,585 shares of Common Stock outstanding. These shares are held by thousands of beneficial holders who are geographically dispersed across the country.

20. There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, inter alia, the following:

    a. whether Defendants have violated Sections 14 and 20 of the Exchange Act in connection with the Proposed Transaction; and

    b. whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

21. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

22. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

23. The prosecution of separate actions by individual members of the Class creates a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

24. Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

25. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class a whole.

26. Accordingly, Plaintiff seeks injunctive and other equitable relief on behalf of himself and the Class to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## FURTHER SUBSTANTIVE ALLEGATIONS

**Company Background**

27.     GigPeak is a lead innovator of semiconductor ICs and software solutions for high-speed connectivity and high-quality video compression over the Network and the Cloud. The Company is headquartered in San Jose, California, USA, with operations in Zurich, Switzerland, Auburn, California, USA, and Seoul, Korea.

**The Sales Process**

28.     In July 2015, GigPeak was approached by "Company A" regarding GigPeak's willingness to enter into discussions pertaining to an acquisition of GigPeak by Company A.

29.     Discussions between GigPeak and Company A regarding a strategic acquisition continued intermittently for a number of months and, on January 11, 2016, Company A submitted a draft letter of intent to acquire GigPeak for a total purchase price of $162.5 million. Based upon the fully-diluted equity of GigPeak, the per share price being offered by Company A was approximately $3.07 per share.

30.     On January 12, 2016, the Board met telephonically to discuss the draft letter of intent sent to it by Company A. Although the Board ultimately determined not to pursue a strategic transaction with Company A at that price, the Board directed management to communicate to Company A that the GigPeak was open to receiving a proposal to acquire GigPeak at a higher price per share.

31.     On July 27, 2016, following continued interest from Company A concerning a potential strategic transaction, the Board met telephonically to discuss the possibility of determining whether there was interest from third parties in an acquisition of GigPeak beyond that expressed by Company A. To that end, the Board authorized Gigpeak management to engage in discussions with financial advisory firms Cowen and Company, LLC ("Cowen") and Needham & Company, LLC ("Needham & Company") regarding the possibility of a strategic transaction with other entities.

32.     As part of the process, forty-one entities were contacted, and fourteen entities entered into non-disclosure agreements. Twelve of the fourteen non-disclosure agreements contained standstill provisions, all of which expired in accordance with their terms prior to GigPeak's entry into the Merger

Agreement or terminated automatically in accordance with their terms upon GigPeak's entry into the Merger Agreement. Additionally, GigPeak had management meetings with fifteen entities for acquisition discussions, and received proposals for acquisition from five parties, including Company A.

33. On October 3, 2016, GigPeak management notified the Board that discussions with Company A had ceased in light of Company A's decision to pursue an alternative strategic direction.

34. From October 4, 2016 through February 13, 2017, GigPeak received proposals for acquisition from four parties. These four parties consisted of Company B, a United States based publicly traded company, Investor Y, a Chinese private equity fund, Company C, a publicly traded Chinese corporation, and IDT.

35. IDT's proposal for acquisition occurred relatively late in the shopping period. On January 6, 2017, Dr. Sailesh Chittipeddi "(Chittipeddi"), IDT's Executive Vice President of Global Operations and Chief Technology Officer, e-mailed Dr. Katz to ask for a meeting to discuss a potential commercial collaboration.

36. On January 11, 2017, the Company and IDT entered into a confidentiality agreement for the purpose of exploring some strategic business opportunity of mutual interest.

37. On January 16, 2017, Company management met with members of management of IDT to discuss the possibility of IDT acquiring GigPeak. Shortly thereafter, representatives of IDT and GigPeak negotiated the terms of a second non-disclosure agreement for the purpose of discussing a potential acquisition of GigPeak. The confidentiality agreement contained a standstill provision that prohibited IDT from: (i) acquiring or seeking to acquire more than 5% of the outstanding number of shares of any class of voting securities of GigPeak or certain of GigPeak's affiliates; (ii) making any public announcement with respect to entering into or seeking to enter into an acquisition transaction or other business combination involving all of or part of GigPeak; (iii) making a solicitation of proxies to vote or influence the voting of any voting securities of GigPeak or any of its subsidiaries; or (iv) forming or joining a group with respect to any voting securities of GigPeak or any of its subsidiaries without the consent of the other party.

38. On January 17, 2017, the Company provided IDT with certain financial information that

included nonpublic information about GigPeak.

39. Discussions between IDT and GigPeak continued throughout the later part of January, on January 26, 2017, IDT sent to GigPeak a draft of a non-binding letter of intent for the acquisition of GigPeak by IDT at a total acquisition cost of $250 million.

40. The Board met on January 27, 2017 to consider the proposal. During the meeting, the Board directed management to proceed to negotiate with IDT and finalize a revised draft letter of intent with a per Share price of at least $3.05 and a break-up fee of no more than 4.5%. Shortly thereafter, GigPeak provided a revised non-binding proposal to IDT for the acquisition of GigPeak by IDT. The revised non-binding proposal included a purchase price of $3.11 per share in cash.

41. On January 28, 2017, IDT delivered a revised non-binding, non-exclusive letter of intent for the acquisition of GigPeak by IDT at a purchase price of $3.08 per share and a break-up fee of 4%. Under direction from the Board, Dr. Katz proceeded to execute this non-binding, non-exclusive letter of intent.

42. Beginning on January 29, 2017, following the execution of the letter of intent, IDT and its representatives proceeded to engage in diligence of GigPeak both in person and remotely, and the parties continued negotiation of various terms of a merger agreement.

43. On February 7, 2017, members of management of IDT met with Dr. Katz and certain members of senior management of GigPeak to discuss the terms of continued employment after the acquisition of GigPeak. Details pertaining to which members of GigPeak's senior management took part in these negotiations are not included in the Proxy.

44. On February 11, 2017, the Board met and Cowen and Needham & Company rendered their fairness opinions. The Board then approved the Merger Agreement and the Transaction. On February 13, 2017 the Company and IDT finalized and executed the Merger Agreement and related documents.

45. Following the close of market on February 13, 2017, the parties issued a joint press release announcing the merger.

**The Recommendation Statement Omits Material Information**

46.    On March 7, 2017, GigPeak filed the Recommendation Statement with the SEC in support of the Tender Offer commenced by IDT. As alleged below and elsewhere herein, the Recommendation Statement contains material misrepresentations and omissions of fact that must be cure to allow GigPeak's stockholders to render an informed decision with respect to the Proposed Transaction.

47.    The Recommendation Statement omits material information with respect to the process and events leading up to the Proposed Transaction, as well as the opinions and analyses of GigPeak's financial advisor and critical information concerning the Company's expected future value as a standalone entity as reflected in the Company's financial projections. This omitted information renders the statements made materially misleading and, if disclosed, would significantly alter the total mix of information available to GigPeak's stockholders.

48.    Specifically, the Recommendation Statement fails to disclose material information regarding the financial analyses performed by the Company's financial advisors, Cowen and Needham & Company, in support of their so-called fairness opinions.

49.    With respect to Cowen's *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose: (i) the terminal value of GigPeak; and (ii) the definition of unlevered free cash flow as used by Cowen.

50.    With respect to Cowen's *Analysis of Selected Publicly Traded Companies*, the Recommendation Statement fails to disclose the individual multiples and financial metrics for the companies observed by Cowen in its analysis.

51.    With respect to Cowen's *Analysis of Selected Transactions*, the Recommendation Statement fails to disclose the individual multiples and financial metrics for the transactions observed by Cowen in its analysis.

52.    With respect to Needham & Company's *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose: (i) the range of illustrative terminal enterprise values for GigPeak; and (ii) the definition of unlevered free cash flow as used by Needham.

53. With respect to Needham & Company's *Selected Companies Analysis*, the Recommendation Statement fails to disclose the individual multiples and financial metrics for the companies observed by Needham in its analysis.

54. With respect to Needham & Company's *Selected Transactions Analysis*, the Recommendation Statement fails to disclose the individual multiples and financial metrics for the transactions observed by Needham in its analysis.

55. With respect to Needham & Company's *Premiums Paid Analysis*, the Recommendation Statement fails to disclose the merger and acquisition transactions observed by Needham in its analysis.

56. Lastly, the Recommendation Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

57. Specifically, the Recommendation Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of Gigpeak's officers and directors, including who participated in all such communications, including, but not limited to, such communications that took place on February 1, 2017.

58. IDT and a number of GigPeak's executive officers, Dr. Raluca Dinu ("Dr. Dinu"), Andrea Betti-Berutto ("Betti-Berutto"), and Darren Ma ("Ma"), each entered into agreements for continued employment following the consummation of the Merger. These agreements provide for salary, signing bonuses, bonus plan eligibility, and retention bonuses for each of Dr. Dinu, Ma and Betti-Berutto, as well as awards of IDT's restricted stock units for Dr. Dinu and Mr. Betti-Berutto. Additionally, Dr. Katz stands to benefit significantly following the consummation of the Merger. In fact, Dr. Katz will benefit to the tune of $31,119,822. However, details regarding when IDT first expressed interest in retaining management are absent from the Proxy.

59. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

60. Without disclosure of these issues, the Recommendation Statement violates SEC regulations and materially misleads GigPeak stockholders.

61. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**Claims Against All Defendants for Violations of § 14(e) of the**

**Securities Exchange Act of 1934**

62. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

63. Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. § 78n(e).

64. As discussed above, GigPeak filed and delivered the Recommendation Statement to its stockholders, which defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above.

65. Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the tender offer commenced in conjunction with the Proposed Transaction. Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66. The Recommendation Statement was prepared, reviewed and/or disseminated by defendants. It misrepresented and/or omitted material facts, in connection with the Merger as set forth above.

67. In so doing, defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of § 14(e) of the Exchange Act. By virtue of their positions within the Company and/or roles in the process and in the preparation of the Recommendation Statement, defendants were aware of this information and their obligation to disclose this information in the Recommendation Statement.

68. The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares or seek appraisal. In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to stockholders.

69. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

70. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

## COUNT II

**Claims Against All Defendants for Violations of § 14(d)(4) of the Securities Exchange Act of 1934 and SEC Rule 14d-9 (17 C.F.R. § 240.14d-9)**

71. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

72. Defendants have caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Proposed Transaction.

73. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.

74.     The Recommendation Statement violates § 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which render the Recommendation Statement false and/or misleading.

75.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

76.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

77.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

## COUNT III

### Against the Individual Defendants for

### Violations of § 20(a) of the 1934 Act

78.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

79.     The Individual Defendants acted as controlling persons of GigPeak within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of GigPeak and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Recommendation Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

80.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

81.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Recommendation Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in the making of the Recommendation Statement.

82.     By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

83.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(d) of the 1934 Act and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, Plaintiff is threatened with irreparable harm.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiff as the Class representatives and his counsel as Class counsel;

(B)     declaring that the Recommendation Statement is materially false or misleading;

(C)     enjoining, preliminarily and permanently, the Proposed Transaction;

(D)     in the event that the transaction is consummated before the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(E)     directing that Defendants account to Plaintiff and the other members of the Class

for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties.

(F) awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(G) granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: March 13, 2017  **LEVI & KORSINSKY LLP**

By: /s/ *Rosemary M. Rivas*
 Rosemary M. Rivas

Rosemary M. Rivas
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

Donald J. Enright (to be admitted *pro hac vice*)
Elizabeth K. Tripodi (to be admitted *pro hac vice*)
**LEVI & KORSINSKY LLP**
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 337-1567
Email: denright@zlk.com

*Counsel for Plaintiff Felix Mendoza*